[Calhoun v. Thompson.]

# Calhoun *v.* Thompson.

## *Trover for Conversion of Horse.*

1. *When witness may refuse to answer question, as criminating himself.*—A witness is not excused from answering a question, on the ground that the answer will criminate himself, when a criminal prosecution for the imputed offense is already barred by the statute of limitations.

2. *Predicate for secondary evidence of letter.*—Proof that a letter was used before a justice of the peace, on a preliminary criminal examination, and cannot be found—not showing when, where, by whom, or of whom inquiry and search were made—is not sufficient to let in secondary evidence of its contents.

3. *Sale by bailee.*—As to third persons, a bailee has a special property, incident to the possession, which enables him to protect the property against mere wrongdoers, or recover it from them; but, unless authorized by the terms of the bailment, he cannot make a sale which will alter the general property of the bailor, and divest him of the right to maintain trover for its conversion, against the bailee, the purchaser, or any one claiming under such sale.

4. *Sale by agent.*—A purchaser of personal property acquires only the title of his vendor; and if he buys from an agent, who has no authority to sell, his good faith in making the purchase does not impair the title of the principal.

5. *Liability of bailee to bailor.*—As a general rule, a bailee cannot dispute the title of his bailor; but he may yield the possession to the true owner, on demand; and when sued in trover by the bailor, may show, in defense, that he surrendered the property on the demand of the true owner.

6. *Sale by agent; what constitutes contract between principal and agent.*—Where an agent for the sale of sewing-machines, having possession of a horse belonging to his principals, which was used in the business, was informed by them, by letter, that he would be charged with the horse on their books, unless he returned, and rendered an account of his sales; after which, without returning, or rendering an account, he sold the horse to another person, to whom he showed the letter; *held,* that while the principals might, perhaps, at their election, sue the agent in trover for the conversion of the horse, or in assumpsit for its value, the agent could not treat the letter as a proposition to sell him the horse, and the purchaser from him, having knowledge of the letter, acquired no title against the principals.

APPEAL from the Circuit Court of Macon.

Tried before the Hon. GEO. W. GUNN, an attorney of the court, selected by the parties on account of the incompetency of the presiding judge.

This action was brought by Thomas B. Thompson, against Thomas J. Calhoun, to recover damages for the conversion of a horse; and was commenced on the 11th August, 1873. The defendant pleaded "the general issue, with leave to give any special matter in evidence, and fraud; and plaintiff replied, with like leave." The horse in controversy belonged to Titsworth, Scott & Co., a mercantile firm in Montgomery,

who were engaged in selling sewing-machines manufactured by Wheeler & Wilson, and was in the possession of C. J. McNulty, their agent, in Tuskegee, Macon county, in July, 1873, being used by him in their business; and was sold by said McNulty to the plaintiff, on the 24th July, 1873. The horse was kept by McNulty in the defendant's livery-stable in Tuskegee; and was delivered by the defendant to Titsworth, Scott & Co., on their demand, the day after the sale by McNulty to the plaintiff, and after the plaintiff had informed him of the purchase from McNulty. The plaintiff, being examined as a witness for himself on the trial, as the bill of exceptions shows, testified "that he bought the horse from said McNulty, on the 24th July, 1873, and paid him ten dollars in cash, a bar bill for about seventy-five dollars, and some other claims against him; that a bill of sale for the horse was made to him, which he did not produce, not having it with him; that the horse was then in the defendant's livery-stable, where said McNulty had put him; that he notified the defendant, on said 24th July, 1873, that he had bought the horse from McNulty, and claimed him as his own, and not to let any one have him; that the defendant agreed to do so; and that said McNulty fled from the State on the night of said 24th July, 1873. Something having been said on the trial as to a warrant for his arrest, witness was asked, on cross-examination, if he did not go with said McNulty, on the night of said 24th July, 1873, from Tuskegee to Chehaw, that McNulty might get on the train; to which the witness said, 'he would never answer that question.' The court sustained the objection, that the witness was not bound to make any statement which would criminate him; to which ruling the defendant excepted."

The plaintiff also introduced and read to the jury, without objection, a letter dated "Montgomery, Ala., June 19, 1873," addressed to "C. J. McNulty, agent, Tuskegee," and signed "Titsworth, Scott & Co., *per* Slorah," in these words: "Dear Sir—We wrote you, some few days after I came back, to come to Montgomery, if you were not pleased with your horse. If the horse suits you, and you are willing to pay us what we paid for him, and run the risks, &c., you can keep him; otherwise, we will ask you again to come to Montgomery with him, or you shall be compelled to take him. Will you please let us see you, or hear from you at once? Make your report on or before the 28th, and oblige," &c. As to Slorah's authority to write this letter, the evidence was conflicting: he himself testifying "that he had no authority to sign the names of Titsworth, Scott & Co. to it, but he sometimes did things without authority;" while it was proved

that, on a preliminary examination before a justice of the peace on a charge of embezzlement against McNulty, he swore that he had authority to sign their name to the letter; and M. C. Scott, a member of the firm of Titsworth, Scott & Co., testified that he had no such authority. "It was proved by *T. J. Calhoun,*" during the further progress of the trial, "that he remembers of certain letters written by said Slorah to McNulty, and among them was a letter in which it was stated, that the horse had been charged to McNulty. Defendant objected to proving any expression in a letter which was not produced. It was stated that this letter had been attached to the answers of said Slorah as a witness on a preliminary examination for embezzlement by McNulty, and left with the justice, and could not be found. Witness Calhoun could not give the date of the letter, nor identify it. Defendant objected to the witness testifying as to any single expression, without giving the substance of the letter, or identifying it more clearly; but the court overruled the objection, and allowed the answer; to which the defendant excepted."

The defendant introduced said M. C. Scott as a witness, who testified, among other things, that the horses and wagons used by Titworth, Scott & Co. in their business belonged to them, and not to their agents, and were under his exclusive control; "that the horse in controversy was taken by them on trial, and they had not determined whether they would take him or not, there being some objection to him; that they had not paid for him, or agreed to take him, until after the 24th July, 1873; that their agents were required to make weekly reports to them in Montgomery; that McNulty was in default for six weeks, and was neglecting his business, and drinking and frolicking, as he was informed; that every effort was made to get him to come to Montgomery, but failed," and that said Slorah was sent several times to Tuskegee to see him before said 24th July, 1873. There was other evidence on the trial, but it is not necessary to state it.

The court charged the jury, among other things, as follows:
"1. If a bailee of goods, who has a special property in them, sells or delivers them to another as his own, *bona fide*, and without notice, the general owner can not maintain trover, because, by such sale, by one who has a special property in, and possession in fact of the goods, the property of the general owner is altered.

"2. If, therefore, the jury believe from the evidence that the plaintiff purchased the horse from McNulty in good faith, and made payment therefor, while McNulty was in posses-

[Calhoun v. Thompson.]

sion, with a special property in the horse, if such he had; and that the horse was delivered to the plaintiff; and that the defendant, after such sale and purchase, agreed to hold the horse for Thompson, but subsequently, without the assent of Thompson, disposed of the horse, or delivered him to Titsworth, Scott & Co., without the assent of Thompson: that such delivery was a violation of the terms of the bailment, if there was such bailment, and amounted to a conversion.

"3. If McNulty, while he was in possession of the horse, and while he had a special property in him, if such he had, received a letter or letters signed Titsworth, Scott & Co., by Slorah, mailed at Montgomery, ordering or requiring him to come to Montgomery, and inquiring how the horse suited him; using the term 'yeur horse,' and saying that, if he did not return to Montgomery by such time, the horse would be charged up to him on the books of the company; and these letters were seen by plaintiff, and he purchased the horse fairly and in good faith about a month afterwards, without McNulty having gone to Montgomery at all; and such letters were written by authority of Titsworth, Scott & Co.,— conveyance of the horse by McNulty, fairly and *bona fide* made, would vest the title in the purchaser, whether the horse was or was not charged up to McNulty on the books.

"4. It is not every offer of sale made by letter which requires a response in order to complete the contract. The terms of an offer may be such, that a *man's*(?) silence, or failure to act, will be as effectual as a response; and if the jury believe, from the evidence, that the terms of one of the letters was, that if he, McNulty, did not come to Montgomery by such a time, the horse would be charged up to him on the books of the company, his failure to go to Montgomery by that time, or to respond to such proposition, would be an affirmance, more especially in favor of a purchaser from him."

These charges, to which the defendant excepted, together with the refusal of certain charges asked by him, and the rulings on questions of evidence above set forth, are now assigned as error.

R. F. LIGON, for the appellant, cited *Fisher v. Campbell*, 9 Porter, 210; Addison on Contracts, 38; Chitty on Contracts, 4; *Tucker v. Woods*, 12 Johns. 190; *Train v. Gold*, 5 Pick. 380; *Eskridge v. Glover*, 5 Stew. & P. 264.

BRICKELL, C. J.—1. The humane maxim of the law is, that no one is bound to accuse himself. A witness, though

a party to the suit, can not be compelled to answer any question, the answering of which may expose, or tend to expose him, to a criminal charge, or to any kind of punishment.—2 Phill. Ev. 929 ; 1 Green. Ev. § 451. In the first instance, it is the province of the court to determine whether any direct answer to the question proposed will furnish criminating evidence against the witness. If it is not apparent such would be the tendency of the answer, the witness is not privileged from testifying. While it is of the highest importance to protect the witness from self-crimination, it is also of importance that the privilege the law extends to him should not be perverted to the suppression of evidence which can be safely given.—2 Phill. Ev. 933. We can not discover that the evidence sought to be elicited could have the least tendency to criminate the witness. It may have a tendency to bring shame on, or degrade him. The privilege extends only to questions, the answers to which may criminate.—*Hall v. State*, 40 Ala. 706. An affirmative answer to the question would have introduced evidence of materiality in passing upon the *bona fides* of the purchase of the horse. If it had been shown that McNulty had committed a criminal offense, and that the plaintiff, having knowledge of it, aided him to escape, his offense would have been that of an accessory after the fact, which is a mere misdemeanor.—R. C. § 3589. More than twelve months from the commission of the offense had elapsed, when the witness was testifying, and a prosecution for it was barred by the statute of limitations.—R. C. § 3952. The privilege extends only to offenses, for which the witness is liable to be punished, and does not exist when a prosecution is barred.—2 Phill. Ev. 933 ; *People v. Mather*, 4 Wend. 229. The court was in error, in not compelling the plaintiff to answer the question propounded him on cross-examination : whether he did not go with McNulty from Tuskegee, on the night of the day he purchased from him the horse, that McNulty might get on the train.

2. Letters, the contents of which are material, should be produced, or, if not produced, their absence should be accounted for, before a witness can testify to their contents. A mere statement that the particular letter, the contents of which are to be introduced in evidence, was used before a justice of the peace, and can not be found, is not accounting for its absence, so as to let in secondary evidence of contents. By whom, or when, or where, or of whom, inquiry and search was made, is not shown. The existence of the letter, an ability on proper effort to produce it, was not negatived, and secondary evidence of its contents ought not to have been received. Nor was there evidence that the letter was in the

[Calhoun v. Thompson.]

hand-writing of Slorah, or that the witness Calhoun was capable of testifying to his handwriting.

3. A bailment is a contract, and its terms, and the rights and liabilities of bailor and bailee, depend on the agreement of the parties. As to third persons, a special property is incident to the possession of the bailee, which enables him to protect the thing bailed, from injury by mere wrongdoers, or to recover it from them. Unless it is a part of the contract of bailment, that the bailee may sell, we are not aware of any case in which a sale by the bailee will alter the general property of the bailor, and divest him of the right to maintain trover for its conversion, against the bailee, or the purchaser, or any one wrongfully assuming dominion under such sale. The first charge given by the court below was erroneous.

4. The second charge is also erroneous. If, as some of the evidence tends to show, McNulty had possession of the horse, as the agent of Titsworth, Scott & Co., to be used in conveying the sewing-machines about the country, for the purpose of sale, and had not authority to sell the horse, a sale made by him, whatever may have been the good faith of the purchaser, would not impair the title of his principals. All who deal with an agent are bound to inquire into and ascertain the extent of his authority. A purchaser of personal property acquires only the title of his vendor. If the agent exceeds his authority, the injury can not be visited on the principal, unless he ratifies the act; and it is the misfortune of those who deal with him in good faith, if they suffer loss because he has passed beyond the line of his authority; and it is the misfortune of those who purchase from vendors having no title, if they are compelled to yield the possession of the property to the rightful owner.

5. As a general rule, it is true, that a bailee can not dispute the title of the bailor. If the goods are not the property of the bailor—if in fact they are the property of another, who demands them of him, he may yield to such demand. Thereby he takes upon himself, if sued by his bailor, the burden of establishing the superiority of the title to which he yields.—*Ogle v. Atkinson,* 5 Taunton, 759; Edwards on Bail. 306; *Crosswell v. Lehman, Durr & Co.,* MSS. The second charge given by the court was erroneous in each of its parts. The special property, imputed to McNulty's possession of the horse, carried with it no power to sell; and if his principals had not conferred on him authority to sell, the sale made by him did not impair their title, and gave to the purchaser no right which could be asserted against them. The defendant, having possession of the horse as the bailee

of the plaintiff, could not, ordinarily, dispute the plaintiff's title. But, as there was evidence tending to show he had surrendered the horse to Titsworth, Scott & Co., on demand made by them, and they were the true owners, he is not liable to this action.

6. The third and fourth charges seem to us based on a misconception of the evidence. There was no proposition made by Titsworth, Scott & Co. to sell the horse to McNulty, which would become a contract by McNulty's acceptance in express terms, or by his failure to respond to it within a reasonable time. The letter introduced, and the letter not produced, but the contents of which were shown by secondary evidence, contained no such proposition. They seem to have been written with a view of forcing McNulty to a performance of his duties as agent; and contain avowals of the purposes of the principals, if he did not comply with their request. The letter not produced also shows that they had charged him with the horse, because of his continued neglect to comply with their request. McNulty may have placed himself in the condition of a wrongdoer—of an unfaithful agent, wilfully disregarding the requests and instructions of his principals; but he can not be properly regarded as a purchaser, assenting to a proposition to sell him the horse  If these letters were shown to the plaintiff, before his purchase of the horse, he could not have purchased under the belief that McNulty had property in the horse. An agent can not acquire property which the principal has committed to his care, by a wanton defiance of the instructions of the principal, and of his reasonable requests. Nor can it be admitted that one purchasing from him, with knowledge that the only title claimed by the agent is founded on his infidelity, has any standing in a court of justice as a *bona fide* purchaser. He substitutes himself to the place of the unfaithful agent with whom he deals. It may be, the principals could have elected to proceed against the agent, either in tort, for a conversion of the horse, or in assumpsit, as on an implied promise for the price paid for the horse. But, until they elected the latter action, their right of property remained. Neither the agent, nor those dealing with him, could, for the principals, elect a conversion of his conduct, from the character of tortious, into that of rightful, and a contract.

It is unnecessary to notice the other assignments of error, as it is not probable they will arise on another trial. The judgment is reversed, and the cause remanded.